Good morning, Your Honor. I'd like to reserve a rebuttal in favor of the defendant. The defendant has been found guilty of the crime. The defendant has been found guilty of the crime. All right, if you'd lift the microphone just a little bit, please. Thank you. May it please the court, my name is Valerie Butch and I represent the petitioner in this case, Rafael Maradiaga. Today, Your Honors, we'd like to point out to you the reasons that this case should be granted. The Board of Immigration Appeals decision below is incorrect for a number of reasons. Grant what? There's some... It's a little unclear. Do you believe that we could grant deferral of removal under the CAC? Or are you seeking only a remand to the BIA to review the factual findings under the correct standard? Firstly, we'd like this court to grant deferral of removal under the CAC based on the factual record that's before it. In other words, the facts are so clear as a matter of law we can grant it? Yes, Your Honor. That's right over the plate for you. Did you pick that up? Yes, Your Honor. Although what's the Supreme Court case in the name of Melissa's case a couple years ago that said when we find something's wrong, we as a court can't do that. We have to send it back to the agency for their expertise. Wouldn't we really have to remand and point out that they may have misread the... I assume your argument is they misread the expert report. They did, Your Honor. I don't think that... And we're only talking also about deferral. Yes, Your Honor. That's our only claim here. I don't think that the court necessarily has to remand it for that purpose because the question is a question of law. And whether or not the board violated the Code of Federal Regulations is not something that I think they're entitled to or they violated the regulations is not necessarily something that they have a special expertise on. It's a question of... Well, your argument is that they've got it wrong in the facts, not in the law, right? They created their own facts and that's clearly wrong. And we can review that as a question of law? Yes. I don't see Chevron cited in your brief. I didn't see any alternative if the court doesn't feel that it can do that. We've asked the court to remand it to the board so that the board can correct its own decision by not making its own findings of fact. If they found that the judge was clearly erroneous, they ought to have remanded the case to the immigration judge and not just created things that are not of record. They've already confessed error as to one point, haven't they? The government has already confessed error where the expert of the BIA said would represent the petitioner when he went back to Honduras and he would not therefore go to jail because everybody else has been kept out. And there was no testimony from the expert on that. Bardalis. The expert. Bardalis. Oh right, yes. No, he didn't testify about that and I think that's clear. And that was a predicate for really a lot of what the BIA did because the fact that his organization would be able to keep the petitioner out of jail would mean he would not be tortured because he's kept everybody else out of jail. That was what they said. But the government has said that that was a misstatement, that that was a mischaracterization of the record, correct? And isn't that the house of cards on which the BIA's opinion was built? I will not ask any more questions. There was another one that was right over the plate. Their decision relies on that and several other points as well that we dispute, including whether or not we approved the state actor requirement, which I believe that we did based on the evidence of record, including statements by very high up officials in the Honduran government that they intend to eliminate the gang members of Honduras. How about the fact that he's covered over the gang tattoos with Chinese symbols? Does that matter or did the expert speak to that? The expert did testify about that and what he said was that police officers don't necessarily distinguish between gang tattoos and regular tattoos, that to the police in Honduras any tattoo is going to identify a youth like my client as a gang member. I think his testimony was uncontested in that there was no evidence to suggest otherwise in the record that my client would be anything but identified as a gang member. And so I think the record is clear on that, that both he'd be identified and that ultimately he would be jailed and we presented a plethora of evidence on what's happening to folks who are identified as gang members in Honduras, including killing in the prisons, killing outside of the prisons and other types of torture that clearly amount to torture under the convention. Is there anything in the record that supports the BIA's finding that it is unlikely that he will face imprisonment upon his return? And I guess I'm asking you that and now I'll ask your colleague to address that as well. What in the record would support that statement by the BIA? That it's unlikely he would face imprisonment upon his return? I mean if you can't think of any that's okay. I think, I mean I understand what the Department of Homeland Security's arguments were below and they were clearly that they felt my client's tattoos were not specifically gang tattoos. Our expert addressed that issue. They felt that somehow  But I think the record that we have before us, the expert's testimony addresses all of the issues in question. And the government didn't have an expert, did it? They didn't have an expert. But then again, that's that house of cards I referred to before where the expert said, purportedly said, I'll keep him out of jail. And that's, it was on that basis that the BIA found that it's not likely that he'll be tortured. That was certainly one of the grounds that they raised, yes. Well he said not a single youth who's been represented by the organization has been imprisoned. And that they would help him. But later on in the testimony he still said there was a high probability. Yes, he did. He said that once he entered prison there would be a high probability of torture in prison and he cited to the prison fires and the conduct of the guards during the prison fires and the conduct of prison trustees during the fires, which indicates that they were acting with the instigation of public officials. There's no evidence here in this record, is there, that he would not be detained? That's what I was asking. I don't only that, I don't see anything in the record that suggests that he will not be detained eventually. Eventually, I mean on landing. Is there any evidence that he will not be detained when he arrives in Honduras? Not in the record, Your Honor. I mean the expert really talks about the police. Presumably they're at the airport, so they take their shirts off, they'll see the tattoos, they'll be detained. They do search, they do take the shirts off and search for tattoos. That's definitely in the record. So wearing a big turtleneck's not going to help him, huh, in Honduras? No. There was a testimonial in the evidence from a young man who was required to remove his shirt and onlookers started shouting kill him when they saw the tattoos that he had. I think it's impossible for them to just cover it up and these young men with these tattoos are in hiding. Some of them try to have them removed, but I don't think that it's a successful thing and it's simply not in the record. I mean my client has five tattoos, they're prominently placed, arms, neck, hands, and the expert said that they would identify him as a gang member. I don't think he has a chance of surviving for very long in Honduras. Of course that was another basis on which the BIA ruled that he would like to have his tattoos removed or at least made innocuous, but he's detained. What did they do? Bring plastic surgeons into prison to do that? The BIA, I think that was being somewhat disingenuous. It's not very likely because I did look into that actually for clients and you have to have them go to multiple appointments to have these tattoos removed. It's very invasive, it's expensive, and it's something where you're asking a person to subject themselves to burning off of their skin and I mean I don't know that the laws should require that. Let me ask you a question. The BIA's dissenting member pointed out that if she had her druthers, I guess, that it would be remanded to the IJ for some more findings on risk of torture. What's your position on that? Is there enough in the record on risk of torture? On risk of torture? Yes. I believe it's overwhelming evidence as a matter of fact. I mean we even have statistics where thousands of children have been killed every year and there are very few investigations. The number of gang members killed in the prisons, I think that's all the time I have. That's okay, go ahead. In addition to statements made by high officials like the Minister of Security saying that he wants to eliminate all the gang members of Honduras. I mean that combined with the lack of investigation regarding the prison fires, the fact that one head of police who does take action against this is fired from her job, her office is ransacked and she starts receiving death threats. I mean the government of Honduras is clearly out to eliminate these kids. So you think there's enough in the record? I do. I think that under Camara we can't be required to show more. It's a qualitative consideration and not quantitative. It would be impossible to present statistics but in fact we even have done that here. I don't see how it would be possible to ever present more. On rebuttal, Ventura is the case I was trying to think of where the Supreme Court told us not to decide on our own. On rebuttal, give me your best case for the proposition that instead of remanding we should decide for ourselves. I had one other question. I may have missed this. Are you still pursuing your CAT claim? I'm pursuing the CAT claim and that's all that we have. The deferral under CAT. Okay, alright, gotcha. Thank you. Alright, we'll hear from you on rebuttal. May it please the court. Hold the microphone down a little bit please so we can hear you. It'll come towards you. There you go. May it please the court. My name is Lyle Jenser. I represent the government today and it appears I have my work cut out for me. Yes, how perceptive. Sorry about that. I think I would like to start off with the Ventura question to start with. And if you could speak into the mic. These are recorded so that's why it's important. Okay. There was conflicting factual information in this case. Very much conflicting. If you look at the BIA's decision, they did not just rest on that one statement from Bardalis that he would represent. Actually, in the decision itself, it says, contrary to the immigration judge's conclusion, the respondent's expert demonstrated that, especially if helped by the Honduran Youth for Progress organization. So there is some question whether they recognized that he had not specifically said he would help. But the expert opined that he was going to be persecuted. Unless they explained that away, or unless there was conflicting testimony by another expert, how can they substitute their judgment for the expert's? What the expert said, Your Honor, was that if he goes to jail, he will be facing very harsh conditions such as the fires. The expert said 200 people, so 200 gang members have been killed in the prisons. In our country, youth being members, around 220 youth have been murdered within the prisons and that's in the last two years. A very powerful risk, a very high risk, and it's a very high probability that he will receive hostilities against him. Very, very, very bad treatment. At least that. Now, we have to step back to look at, play that against this court's precedence. First of all, that's an opinion. But secondly, he's talking about very harsh prison conditions. Receive hostilities against him. Well, yes, but a lot of that's from gang members themselves. The point is that we do know that in one of the riots, there was a prosecution of the deputy warden who was in charge, and he was convicted of attempted murder for the deaths of these gang members. One guy? How many hundreds of people have been murdered, burned, shot? Before my opponent spoke about Honduran youth, anyone without tattoos, the fact that maybe conditions in Honduras are very bad, that's irrelevant to this. The fact that street children may be harmed has nothing to do with somebody with tattoos with a gang member. That's totally irrelevant. We're talking about the gang members themselves, and what's happened is the Honduran government has shown to an extent that it is working. It does not have, it's not acquiescing, it's prosecuting people for doing this. The immigration judge made specific findings, A31, A32, for example, government complicity in the murder and suffering of gang members. Can't be more specific than that. That's a factual conclusion. This immigration judge's opinion, in my humble opinion, is the second best immigration judge's opinion I've read in my years. It is long, it is thorough, it is balanced, it looks at it from both sides. It looks at it from the point of view of the Honduran government wanting to get rid of violent gangs, and then it looks at it from the point of view of someone who is a gang member in petition, or former gang member in petitioner's position. So we can't, that's why we have immigration judges, to do work of that quality, and that work was ignored by the BIA. No, the BIA, well, I can't refute what the judge is saying. Your Honor obviously has her opinion. And the BIA opinion definitely has its problems. I mean, I think I'd be foolish to not concede that. The BIA does have the authority under the reg, and is delegated by the Attorney General, to re-weigh the facts. The immigration judge finds historical facts. The BIA then, on the same facts, can look and say, your final conclusion doesn't quite fit. In this case, we find that there's enough evidence that he hasn't shown he will be tortured. Now, isn't that based largely on the erroneous conclusion that the experts organization would be representing him, and nobody that the organization has represented before has been detained? Well, it is unfortunate, and it's a little bit strange, because the question that you're asking, the immigration judge had asked him. Once that answer came out, he just stopped and said, that's enough. He never went on to the next obvious question. Agreed, but there's no evidence that he would not. We don't know that yet. And that's why I think I'd like to back down and go back to Ventura. I think we all know where this case is going. Now, the real question is, is this court going to order deferral, which, in the government's view, does not have the authority to do, or does it need to go back to the BIA and say, hey, we're not sure what scope of review you implied, and you committed a factual error. Now, Judge Filpo, and by the way, Your Honor, it is a man. I made the same error, and my boss chewed me out. But Judge Filpo is a man. He himself, when he looked and said, it looks like we need to go back, at least to the immigration judge. Only as to evidence as to a particular gang member, not as to evidence the other evidence. But we don't care about the other gang members. We care about this one gang member. That's why we don't have to go back on any particular gang member. But we have to go back. The government still believes the case does need to be remanded to the BIA. BIA, you apparently, more than apparently, you misstated the expert's testimony in this specific regard, and not in the other regards. You also issued a somewhat contradictory statement when you said, if he represents them. We need you to clarify that. We need you to explain the scope of review that you used, and was this the key part of your decision? Is this what you based it on? If you look at the BIA's decision, they gave a whole bunch of other facts, including the fact that torches are outlawed in Honduras, the fact that Honduras works with two non-governmental agencies, and that's not even including Mr. Bardella's agency, to correct these problems, and to fix the prisons. There were prosecutions, and it wasn't just the deputy warden. There were other people who were prosecuted. Maybe we want to go back, and maybe this is a case where it should be remanded to take a look at the new country reports. Has there anything else been going on? Because although it's only two years removed, a new country report just has come out, there's no evidence of any of this. We don't know. The point is, if the BIA made an error in its decision, and the court clearly has jurisdiction to review that, then it needs to go back on that and say, now, you apparently exceeded your scope of review, or you made an error. We need you in the first instance. They did a selective read of the expert's testimony, and pulled out a couple of specific things that he'd said earlier on, and then neglected his opinion, which I assume they're crediting. I assume they're crediting the expert. We don't have any problem with that, because they buy a couple things that he said. But then later, when he opines that it's a very, very high risk, it's very tough to go back and say to the BIA, please remand to the IJ, because this is in here, and based on this, he should win. Why do we have to go through that exercise? Because you'd be finding facts. You're balancing the facts, and because he is a criminal with an aggravated felony conviction, this court does not have that jurisdiction. Only to correct an error of law. The error of law was that the BIA misstated one thing. The BIA also raised many other facts, many other conclusions, and that expert had never seen this petitioner. He did opine that when you cover up a gang-related tattoo, that's a strong indication of renunciation, and if you renounce, you have a good shot. That was also in his testimony. The more important question, though, beyond renunciation, is whether he'll be detained in the first instance. And at what point will he have the opportunity to show that he renunciated, if that's the word. Because if he's detained, as soon as he arrives, then we're right into the possibility of torture. But that's also a question of fact, Your Honor, and that's got to be determined in the first instance by the agency, not by the court. My first question out of the box before I made a total pain out of myself was to ask about, effectively, the summary judgment standard. If there are material facts in dispute, summary judgment cannot be granted. But if there are no material facts in dispute, summary judgment can be granted as a matter of law. And analogizing to that, there are material facts that are in dispute. We don't know what's going to happen to this young man based on that testimony, because he has covered up one of his tattoos. We don't have any information now about the other tattoos. We don't have any information. We do have the expert testimony that he's fixed one of his tattoos, but it doesn't matter whether it's gang tattoo or ordinary tattoos, and the evidence is uncontested, they take their shirts off. I don't know what challenges that testimony. But he actually contradicted himself. He started off, and there was other evidence in the documentary evidence, that certain tattoos are not gang related, and that the police should be able to know it, and that the judges often, because if the police confuse it, they won't consider that. Here you have a kid who says he's renounced, who's covered it up. The expert has said, when his organization represents people in this very same situation, none of them have gone to jail. That is important. Combine that with the fact that there is a very real question as to the specific intent of the government. If the government intended to torture and to murder, they would not have prosecuted the deputy warden and the others. That's so they put in the country reports that they did it, so they can keep on doing it. That's a question of fact, Your Honor, and that's a type of question that the BIA should be able to address in the first instance. Maybe with guidance from this court saying, hey, you have not addressed this, and we need it to be addressed, but it does need to be addressed before this court rules. We don't believe there's quite enough here for a summary judgment. Of course, the flip side of that is that would mean anyone with a tattoo can never be deported based on that rule. That's something that the BIA... That's, of course, a question that naturally arises. That's a question, because it's so important, let's give the BIA the opportunity to do its job. If this court feels it hasn't... If this man does not get deported, it will be because his counsel has done, from day one in this case, a terrific job of bringing in enormous amounts of evidence of torture, of the conditions in Honduras, of what he likely faces. I think it's one of the best blue briefs I've seen, and your brief is excellent, too. And that, if he gets the relief that he's seeking, that will be largely the reason why. We don't see that in all these cases, so the mere fact that somebody has a tattoo does not mean as a matter of law that he or she is going back to Honduras. That will be the practical effect, Your Honor. And when it's that important, because there are factual disputes here, and that's exactly what we've been talking about throughout this entire argument. Because he's a criminal, this court does not resolve factual disputes. It can't. That's legal sufficiency. Legal sufficiency is something for the agency. It needs to go back to the BIA for additional... to correct its decision, at least to the extent of the error. Then, if the BIA comes back to this, based on the testimony that we have, either we need more or we have enough, we're still going to go that way, then it could come back to here and be right for, as you put it, summary judgment. But it's not at that stage now. Where is he now? He's in detention. Here. He's in detention. It's 236C or 1226C, because he's a criminal. He's not eligible for bond. Let me switch tracks a little bit now. Of course, we take our jurisdiction very seriously. On the one hand, you can see jurisdiction regarding whether the BIA overstepped. On the other hand, regarding, I guess you're saying, sufficiency of the evidence, we have no jurisdiction to review on that basis. Though our Camara case, though, doesn't that say, and I think I know your response, but if there are undisputed issues of fact or undisputed facts applied to the law, we still have jurisdiction, right? Because that's really a legal question. A series of your cases have said that. Yes, Your Honor. That is correct. On the other hand... So what are you saying we can't do, based on jurisdiction? We have, clearly, based on this dialogue that we're going through now, disputed facts. There's a very heavy dispute. The BIA took a look at the factual conclusions that the IJ made, and they said they're incorrect. Petitioner has now said, no, the BIA is incorrect. That's a classic legal sufficiency argument. That is something, because of the criminal conviction under 1252A2C, this court does not have jurisdiction to consider. Now, we understand that 1252A2D is carved out from that for questions of law and for constitutional issues. That's not what we have here. The only way this court can really review this is to do a substantial evidence test. Does substantial evidence support the BIA? Now, it's clear that, from what I'm hearing, that the court does not. I am out of time, if I could just finish this sentence. The answer, really, the answer to a question, to the questions you're posing, is determined by how we pose the question. That is always the case, Your Honor. We figure that out. Thank you very much. Ms. Birch, rebuttal. This is very difficult to explain. I came here to argue the record today, and I have to correct something that opposing counsel said. My client is not in detention. He was deported. He was? He was deported. That's what I was fearing. That's not in the record. We haven't been told that. It's not in the record. Where is he? He's in Honduras, as far as I know. He called me from there at one point. There wasn't a stay, a removal, was there? I never asked for one because he's a young man who didn't want to remain in detention for another year while I fought his case. He opted to take his chances returning. What does that do to our jurisdiction? All I know is that I did research whether you have jurisdiction, and the answer is yes because under jurisdiction to do what? You're looking for deferral of removal. He's been removed. We have spent a long time preparing this case. We have not been advised that he was removed. Looks like the government doesn't even know he was removed, but the relief that you're seeking is deferral, and it's gone. It's moot. That's what I meant by jurisdiction. If we were to reverse, or the agency were to reverse, we've seen these cases come up on rare occasion when the government, when there's a stay of removal pending, we'll pluck somebody out and take them before we have a chance to decide, and we'll bring that person back. I've never seen this happen. We haven't been advised. I didn't think that it removed jurisdiction because of other cases that I read in which people have been brought back. When they're deported, and they shouldn't have been deported, deferral means we bring them back and send them to Belgium. We don't have any... I don't know. What were you hoping to... I guess, what were you thinking you could accomplish? The things that I thought I could accomplish were, because I thought you had jurisdiction, I could argue the record that we do have and ask for the court to either remand to the board to consider the deferral case or to grant it itself. But what happens if we were to do that, if we were to either reverse or the BIA goes back and says, oh yes, so sorry, removal is deferred, he shall not be sent to Honduras, and he's already in Honduras. What can you do with that as a practical matter? As a practical matter, I think that other courts have ordered the person to be brought back because relief had been granted. Yeah, I think that's probably right. Alright, we'll ask council to stay at council table. We're just going to take a break to consider the ramifications of what we do at this point. Maybe we should ask the government what they think in these circumstances with this new fact. Perhaps government council can come to the table. Your Honor, first I apologize. I was not aware of this. The government was not aware of this. I'm not questioning that, but how could it happen that the government deports him and you don't know? He apparently requested it. When there is a stay in effect, as this court is well aware, we've had some difficulties with that. We're very much on top. If there's no stay and someone requests removal, he may have just left. Apparently the agency did not see fit to let me know. They may not have even realized that this case was being argued. Do we know if he left voluntarily, Ms. Burch, or whether he was removed? No, Your Honor. He was removed with an order of removal. There's some record of that. Right. He didn't want to return. He just didn't want to sit in jail for another year. When was he removed? August of 06. This is March. So we've gone through months of briefing and preparation, and he was removed in August. And when did you find out he was removed? In August, Your Honor. It was after I filed my reply brief. I mean, it would be one thing if he were deported. I think there's case law to the effect that he doesn't lose his claim once he's gone, but when deferral or removal is the best he can get and he's been removed. All right, we're going to take a... Maybe Government Castle can shed a little light on that. We can get some clarity. The case is now moot. He is not eligible for cap relief per se because of his conviction. He's not eligible for asylum. In fact, he never even applied for that in his court. He only applied for deferral. That is now gone. And because of his conviction, he's not eligible to return to the country. So the government would say this case is now moot. Subject to further questions? Well, I must say, on behalf of the panel and the court, counsel, you have to realize that we should have been advised of the situation because it does affect our jurisdiction and our ability to do anything. And we have, as Judge Barry pointed out, expended a lot of effort. And in fact, hoping we could write something that we thought was wrong here, as you can tell from our questions. But that does not appear to be the case. And I would just ask counsel in the future to make the court aware of facts that could affect our jurisdiction. I mean, if it were deportation, if it were something else, if it were just a standard cat claim. But once someone's been removed and all they're asking for is deferral or removal as a matter of law, I don't think there's any jurisdiction for us to act. All right. Counsel, I think that ends it for today for this argument. We thank you very much. We'll take the case under advisement, such as it is. All right. Call our next case. Gail versus Attorney General.